William A. Scheuber and Hildegard Scheuber v. Commissioner.
Scheuber v. Commissioner
Docket No. 79638.
United States Tax Court
T.C. Memo 1961-43; 1961 Tax Ct. Memo LEXIS 306; 20 T.C.M. (CCH) 235; T.C.M. (RIA) 61043; February 21, 1961
*306 Petitioner, Hildegard Scheuber, purchased numerous parcels and interests in parcels of improved and unimproved real estate, and title thereto was taken in her name. She sold 82 parcels of unimproved and improved parcels during the years 1949 through 1957. During 1955, 1956, and 1957, the years in which the deficiencies here involved were assessed, she realized gains on the sale of 31 unimproved parcels, a 98-acre tract, and 5 rental properties, all of which were sold during these years except 3 which were sold on an installment basis in 1949 and 1953. She gave full authority to real estate agents, co-owners, or her husband (a licensed real estate broker) to sell the property for her at prices to be fixed by them. She herself was not active in procuring such sales. Her agents advertised and sold the respective properties, exercising practices common to the real estate business. The 31 undeveloped parcels were held to be sold whenever a satisfactory profit could be realized. Most of the parcels were held less than 18 months. The 98-acre tract was purchased for the development of a motel, but was sold when difficulties with the sewer and water departments frustrated the plans therefor. *307 Held: That all of the unimproved parcels sold, except for the 98-acre tract, were held primarily for sale to customers in the ordinary course of business. Held, further: That the 98-acre tract and the 5 rental properties were not held primarily for sale to customers in the ordinary course of business, but were held primarily for investment purposes. E. C. Pommerening, Esq., 231 W. Wisconsin Ave., Milwaukee, Wis., and Glen E. Pommerening, Esq., for the petitioners. William J. Wise, Esq., and James T. Wilkes, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in income tax against the petitioners as follows: Year
Deficiency
1955
$10,132.38
1956
1,843.68
1957
11,453.08
Respondent, by an amendment to his answer, claimed that petitioners are liable for a further deficiency for 1956 because of an unreported gain on the sale of real estate in the amount of $1,139.71. The additional gain was admitted by petitioner; the question of whether it is taxable as long-term capital gain or ordinary income remains in dispute. The parties also stipulated the amount of long-term *308 capital loss on the sale of securities and allowable automobile expense. The primary issue presented is whether or not certain improved and unimproved parcels sold in the years 1949, 1953, 1955, 1956, and 1957 were, in the years in which said sales were made, held primarily for sale to customers in the ordinary course of business. A subsidiary issue relating to self-employment taxes for the years 1955, 1956, and 1957 is dependent upon our determination of the primary issue referred to above. Findings of Fact Certain facts have been stipulated and these are incorporated herein by reference. Petitioners, William A. Scheuber and Hildegard Scheuber, husband and wife, filed timely joint Federal income tax returns for the taxable years 1955, 1956, and 1957 with the district director of internal revenue, Milwaukee, Wisconsin. On the returns for these years, Hildegard reported gains from the sale of 33 parcels of real estate sold during these years and gains realized during these years on three installment sales consummated in the years 1949 and 1953. The following gains were reported as long-term capital gains on the sale of real property on petitioners' return for 1955 Schedule A
Number of
Trans-
Description
actions
Profit
13 parcels, Fairy Chasm
13
$10,309.68
2 lots, Crestwood
1
4,949.48
2 lots, Capitol Intersection
1
5,602.71
4 lots, Capitol Crest
2
11,381.46
1 parcel, Sub. #77
1
791.85
1 lot, Marnitz
1
1,249.16 a
1335 N. Prospect
1
715.27 a
Total
$34,999.61
*309 The following gains (except one which was unreported) were reported as long-term capital gains on the sale of real property on petitioners' return for 1956. Schedule B
Number of
Trans-
Description
actions
Profit
2 acres, Bayside
1
$ 551.93
1 lot, New Butler
1
242.89
22 acres, Mequon
2
3,849.91
1 parcel, Quentura
1
486.29
Farm, Saukville
2
874.30
2 lots, Grantosa
1
612.00 a
1335 N. Prospect
1
699.56 a
98-acre tract
1
2,470.00 a
1 lot, Capitol Crest
1
1,139.71 b
Total
$10,926.59
The following gains were reported as long-term capital gains on the sale of real property in petitioners' return for 1957. Schedule C
Number of
Trans-
Description
actions
Profit
Farm, Saukville
1
$ 2,295.70
1 lot, Milwaukee
1
1,069.27
4 lots, Capitol Intersection
1
13,817.23
2 acres & house (part of farm)
1
251.07 a
2 lots, Grantosa
1
432.00 a
1335 N. Prospect
1
2,827.50 a
98-acre tract
1
9,880.00 a
Total
$30,572.77
*310 Three sales were made during 1955 of property held less than six months for a total profit of $1,522.49. This amount was reported as short-term capital gain of Hildegard. Respondent disallowed long-term capital gain treatment on all gains from the sale of the above properties including the unreported sale and claims that they were held primarily for sale to customers in the ordinary course of business. Petitioners claim that all of the properties were owned by Hildegard as investments; that she was completely passive throughout the transactions involved; that she was not engaged in a trade or business; and that there are "special circumstances" surrounding many of the sales which support the view that the properties were held as investments. William Scheuber has been a licensed real estate broker since 1920 and has engaged in the real estate and insurance business during the years 1949 through 1957. He employed two real estate salesmen who were licensed under him. Hildegard Scheuber has never been a licensed real estate broker and did not actively engage personally in the buying and selling of real estate. During the *311 years 1949 through 1957, William reported the following income from real estate commissions. Year
Commissions
1949
$1,808.75
1950
3,054.35
1951
2,332.88
1952
145.00
1953
212.50
1954
689.58
1955
640.17
1956
1,518.56
1957
1,726.98
In 1954, Hildegard entered into a joint venture to purchase 20 parcels of real estate in the Fairy Chasm area with Harry A. Worth and Edwin Kern who were at that time co-owners of the Shorewood Realty and Finance Company (hereinafter referred to as the company). Worth was president of the company. Although Williams personally entered into the purchase agreement, all of the parcels were deeded to Hildegard. Her actual undivided interest was one-half, and that of Worth and Kern was one-fourth each. Worth and Kern paid Hildegard for one-half of the down payment made for the purchase of the lots. Soon afterward additional parcels were purchased (through Worth acting as president of the company) by Hildegard either alone or jointly with Worth. At the time of the purchase of all of the afore-mentioned parcels, there was an agreement between the interested parties that Worth would have full authority and sole discretion to determine *312 when the parcels would be sold and at what price. Upon the sale of each parcel, Hildegard would execute a deed to the property. The company would deduct its fees and expenses, and pay the balance to Hildegard, Worth, and Kern according to their respective interests. Numerous settlement statements of the company for the years 1954 through 1956, concerning the Fairy Chasm property, were introduced into evidence. All such statements name Hildegard the owner of the property and the recipient of a portion of the profits. All of the property purchased by Hildegard had previously been subdivided and no improvements were made after the purchase. The company, however, was instrumental in having Fairy Chasm annexed to a suburb of Milwaukee in 1954 or 1955. In disposing of all of these properties, Worth, acting as president of the company, followed the policy of holding the property only as long as it was necessary to realize a substantial profit, and pursued the same methods and policies as is customary in the real estate business. Many of the parcels were sold within approximately two years, most of them being sold within the first year. A model home financed by the company in the *313 area was used by Worth as a temporary office from which he conducted sales of the Fairy Chasm lots. Signs were also placed on many of the parcels sold by the company for Hildegard and her co-owners. Nineteen of these parcels were sold by the company in 1955 and 1956 and are now in issue. Thirteen are Fairy Chasm properties sold in 1955 (see Schedule A) which were owned jointly or solely by Hildegard. Four others, the first four sold in 1956 (see Schedule B) were owned jointly with Worth, and two parcels sold in 1955 were solely owned by Hildegard but adjoined lots owned by Worth in Crestwood and Subdivision #77, (see Schedule A). Eight other parcels, in addition to those referred to above, were sold by William personally and are in issue. Three parcels in the Capital Drive area were sold after being repeatedly advertised by William after being informed that the zoning in the area was to be changed from business to residential. Two other parcels in the Capital Drive area and parcels on 50th Street, in Grantosa, and in Marnitz, were also sold. Of these five parcels, one was advertised and the others were sold to persons who contacted William, knowing him to deal in real estate in *314 these areas. William advertised frequently in a local newspaper in connection with his real estate business and many ads, while not referring to particular parcels in issue, referred to the same areas. Another parcel in issue, a 98-acre tract, was purchased by Hildegard in a joint venture with a local attorney for the purpose of erecting a terminal and motel. The tract was sold two and one-half years later in one transaction through the attorney after difficulties in obtaining water and sewage permits frustrated their plans. Another parcel in Quentura was sold by a real estate agency which received a commission therefor. During the years in question, Hildegard owned numerous improved rental properties, most of which were farms. In 1956 and 1957, four of the farms, held for approximately one and one-half years and rented mainly at a loss, were sold by Worth through the company which was paid a commission on the sale. An improved parcel on Prospect Avenue was sold by William to a person answering a "For Rent" sign who sought to purchase the property on an installment basis. Hildegard consulted with her husband in regard to the advisability of selling and buying except in those *315 instances in which the authority and discretion to sell was given to Worth. The sales activity of property owned by Hildegard was as follows: Year
Bought
Sold
1949
7
6
1950
12
7
1951
3
5
1952
4
5
1953
3
6
1954
32
19
1955
11
21
1956
9
1957
1
4
As of the end of 1957 Hildegard continued to own 18 parcels of land. The record does not disclose the year in which they were purchased and consequently they are not included in the "bought" column, supra. None of the parcels in question were improved or subdivided, and they were sold in the same condition as they were when purchased. The duration of real estate held by Hildegard over the years 1949 through 1957 is as follows: under
6 months 20
under
12 months 22
under
18 months 14
under
24 months 6
under
30 months 3
under
36 months 9
over
36 months 8
Opinion The primary issue presented is whether or not profits realized from the sale of certain improved and unimproved parcels during the years in question are to be taxed as ordinary income or as long-term capital gains. Respondent contends that such parcels were, in the years and at the time of sale, held *316 primarily for sale to customers in the ordinary course of business within the meaning of section 1221(1) of the Code of 1954. Petitioners contend that all of the parcels in issue were held as investments and the gains should be accorded capital gain treatment under the same section. The problem of whether real estate, improved or unimproved, is held primarily for sale to customers in the ordinary course of business has been considered by the courts on numerous occasions. In many instances, criteria have been mentioned in the various opinions which may have weight in resolving the issue in a particular case. Among these have been the purpose or reason for the acquisition of the property; the number, frequency and volume of sales; the extent to which the owner or his agent engaged in sales activities, by developing, improving, and advertising the property; and whether the taxpayer continued to purchase more properties during the period as part of a basic plan of buying and selling real estate. Criteria which may be significant in some settings, however, are of little, if any, aid in others. No single factor is necessarily controlling. Inasmuch as each case must be decided on its *317 own facts, no useful purpose would be served by discussing the various fact situations presented by the cases relied on by the parties. See (C.A. 6, 1957), affirming a Memorandum Opinion of this Court. Respondent contends on brief that the property in question was really owned by William and placed in his wife's name as nominee and respondent urges, therefore, that the property should be treated as being a part of William's stock in trade in his own real estate business. We disagree with this contention on the basis of the evidence in the record, but we see no occasion for a labored discussion of the point since we hold, infra, that the properties in question (with certain exceptions which we find, infra, to have been investments) were held by Hildegard primarily for sale to customers in the ordinary course of business. Petitioners allege generally that all of the parcels, the sales of which are in issue, were investments. There are a few which they maintain are surrounded by "special circumstances" which indicate that they were investments. Nevertheless, their main argument is that Hildegard was passive throughout all of the *318 transactions herein involved, and this factor alone prevents any conclusion that she was engaged in the real estate business during the years in question. While "passivity" is a factor to be considered in determining whether property is held as an investment, we cannot agree with petitioners' argument that it is controlling. A socalled "passive" owner can engage in the real estate business and act through agents and may also be a partner or joint adventurer in a real estate business. The actions of his agent or co-owner are directly attributable to him whether or not they are supervised. The mere use of an agent to sell a parcel of land will not of itself establish that the owner is in the real estate business. Examination will be made into all relevant criteria attributing the actions of the agent to the owner. If and when the agent's actions on behalf of the owner are sufficiently substantial to become the conduct of a real estate business, the owner will be held to be engaged in such business. See , affd. (C.A. 6, 1960); , affd. *319 (C.A. 6, 1957); ; (C.A. 5, 1944), affirming a Memorandum Opinion of this Court; (C.A. 9, 1936), affirming . The case of (C.A. 5, 1947), relied on by petitioner is clearly distinguishable. There the court found that the taxpayer was liquidating an unprofitable investment which he had held for many years. Also, all of the property was sold to one developer who developed the property and resold it at his own expense. The developer was an independent contractor rather than an agent, so his actions could not be attributed to the owner. The question, thus stripped of petitioner's main contention, is: Was Hildegard engaged in the real estate business during the years in question through her agents and jointadventurers? From 1949 through 1957, Hildegard was engaged in two facets of real estate transactions. She bought and sold, individually or jointly with others, both developed and undeveloped land. She also held real estate for rental purposes and purchased *320 a 98-acre tract for development purposes. Under these circumstances, it is possible that she may have been both a dealer and an investor in real estate, a dual role which we have previously recognized. See ; . Accordingly, in deciding the ultimate issue in the instant case, we must determine as to each transaction whether the disposition was of property held primarily for sale in the ordinary course of business, or of property held as an investment. During the taxable years, Hildegard disposed of some of her rental properties as well as some vacant and unimproved pieces of real estate. We turn first to a discussion of the latter. Hildegard sold 13 Fairy Chasm lots and 6 miscellaneous lots through the company. There were also 8 parcels sold by William and two sold by other parties. From the beginning Worth, through the company, pursued an active course of conduct in selling property which Hildegard owned entirely or in which she owned an interest. The sales were solicited and many parcels were advertised. Most of them were sold within two years. Clearly, the owners did not intend *321 to maintain the parcels for long-term holding. The sales were frequent and continuous. Petitioners failed to introduce evidence as to the reason for purchasing or holding the parcels other than the bare statement that they were investments. The parcels were not placed with the company after deciding to sell them, but were left with the company from the beginning for the company to sell whenever a satisfactory profit could be realized. This is clearly a path pursued by one engaging in the real estate business. Of the eight parcels sold by William, three of these, in the Capitol area, were sold after being repeatedly advertised. William asserts that he advertised and sold them because he was informed about a change in zoning in the area. Although the reasons for purchasing and selling property may sometimes have significance, the crucial question is the reason for holding the property. There is no evidence that these parcels were purchased or held for any reason different from the others - to sell whenever a satisfactory profit could be realized. A parcel may be purchased with the intention of holding it as an investment but later held for sale in the ordinary course of business. *322 Also, a parcel may be held for sale in the ordinary course of business even though sold prematurely for some reason. In both situations, the reason for holding the parcel is determinative and in both situations the property will be deemed to have been sold in the normal course of business. See , affd. (C.A. 10, 1952); . Of the five other parcels sold by William only one was advertised, while the others were sold to persons inquiring about parcels, knowing William to be engaged in selling real estate in the area. Petitioners contend that since most of these sales were unsolicited, they cannot be held to have been sold in the ordinary course of business. While it is true that William may not have publicly advertised some of the parcels, such advertising was not necessary. He had been engaged in various phases of the general real estate business for many years and he knew and was known to potential customers. Advertising is merely a means of attracting customers, and where an active market exists and potential customers are known and buyers seek out the owner, the *323 employment of conventional methods of advertising may not be essential. See , affd. (C.A. 7, 1960). William was known in the area as a real estate broker and advertised many properties he held for sale. When approached by a potential customer he had complete authority to sell his wife's property. There is no suggestion in the record that he was unwilling to sell any of her property and there is every indication that he did sell whenever he received a satisfactory offer. This is the usual course of the dealer rather than the investor, and petitioner has failed to prove that these parcels were held for investment purposes. We conclude, accordingly, that these parcels were held primarily for sale in the ordinary course of business. One parcel in Quentura was sold by an outside real estate broker for a commission. Here again, we have no evidence to support the view that it was held as an investment, and petitioner has failed to meet the burden of proving that it was held for any reason different from the others which we have decided were held primarily for sale in the ordinary course of business. The 98-acre *324 tract, held for about two and one-half years, was sold in one piece without being subdivided or improved. Both William and Hildegard's co-owner testified that this tract was purchased to erect a motel and terminal and the plans were abandoned after encountering building difficulties with respect to sewerage and water. This testimony was uncontroverted. The tract was not the type of land which was usually held by Hildegard. It was also sold for her by one who was not otherwise engaged in the sale of her properties. We are convinced that this tract was acquired and held at the time of sale, not for sale as part of the real estate business, but as an investment. The gain thereon is therefore entitled to capital gains treatment. See . With the exception of the 98-acre tract, all of the unimproved parcels sold by Hildegard's agents over the years 1949 through 1957, including those in issue discussed above, were not sold in sporadic, occasional, or isolated transactions. During the years 1949 through 1957, a total of 82 sales was transacted. These sales were not made to dispose of long-term investments. The majority of the parcels sold *325 over these years were held for less than 18 months. As of the end of 1957, Hildegard continued to own 18 parcels of land. Petitioners also strongly contend that the absence of improvements or subdivision precludes a finding that the parcels in question were sold as part of a business. While it is true that such action on the part of an owner is a factor to be considered, it is unimportant here, where the parcels had been subdivided prior to purchase and the taxpayer is found to be in the business of selling unimproved lots. The parcels in question, except for the 98-acre tract, were acquired as part of a plan to buy and hold to sell whenever a satisfactory profit could be realized. Hildegard or her agent or joint adventurers may not have aggressively promoted some of the properties or improved them. Nevertheless, the frequency, volume of sales, relatively short duration held, the continuing purchase of more parcels, and the activity of her agents convince us that Hildegard was a dealer in undeveloped land throughout this period. As stated above, a dealer in real estate may hold certain parcels for investment, and the sale thereof may be treated differently for tax purposes. In *326 the instant case, however, we are satisfied that all of the undeveloped properties here in issue, other than the 98-acre tract, were held primarily for sale in the ordinary course of business whenever a satisfactory profit could be realized. The five rental properties (the four farms, and the Prospect Avenue parcel) were sold after either being rented mainly at a loss or after an attempt to rent had failed. There is sufficient evidence in the record to conclude that these parcels were held as incomeproducing investments and not for sale with the other lots in the ordinary course of business. The gains realized on these sales are to be accorded capital gains treatment. See ; On the basis of our view on the principal issues as expressed supra, self-employment taxes will be recomputed for 1955, 1956, and 1957; the deficiency for 1956 arising from the stipulation to amend the amount of gains realized on the sale of real estate will be adjusted; and the long-term capital loss on the sale of securities will be given effect all under the Rule 50 computation. Decision will be entered under Rule 50. *327 Footnotes
a. Profit realized during year on installment sale.↩
a. Profit realized during year on installment sale. ↩
b. Unreported gain included pursuant to stipulation.↩
a. Profit realized during year on installment sale.↩